UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PAUL RONALD COPAS,

       Petitioner,

           CASE NO. 2:09-CV-14744

  v.            JUDGE PAUL D. BORMAN
             MAGISTRATE JUDGE PAUL J. KOMIVES

CINDI C. CURTIN,

       Respondent.
_____/


## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    D.    *Suppression of Evidence (Claim II)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
           a. Criminal Sexual Conduct Charge Against Ousley . . . . . . . . . . . . . . . . . . . . 13
           b. Ballistics Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
    E.    *Sufficiency of the Evidence (Claim III)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    F.    *Joint Trial (Claim IV)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
    G.    *Ineffective Assistance of Counsel (Claim I)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
        1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
           a. Failure to Challenge Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
           b. Failure to Investigate/Elicit Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . 33
           c. Failure to Recall Clint Ousley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
           d. Failure to Object to Dual Juries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
    H.    *Recommendation Regarding Certificate of Appealability* . . . . . . . . . . . . . . . . . . . . . . . 37
        1.    *Legal Standard* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
        2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
    I.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Paul Ronald Copas is a state prisoner, currently confined at the Oaks Correctional Facility in Manistee, Michigan.

2.      On January 26, 2007, petitioner was convicted of two counts of first degree premeditated murder, MICH. COMP. LAWS § 750.316, and two counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Washtenaw County Circuit Court.  On March 13, 2007, he was sentenced to two mandatory terms of life imprisonment without possibility of parole on the murder convictions, and to two mandatory consecutive terms of two years' imprisonment on the felony-firearm convictions.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      THE DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN THE FOLLOWING WAYS:

    a.  Trial counsel failed to challenge the waiver of Miranda rights and the giving of the two statements given as being voluntarily, knowingly  and intelligently made.

    b.  Counsel failed in two key aspects to elicit evidence that supported the defense.

    c.  Defense counsel's failure to ask to recall Clint Ousley or failure to ask for a mistrial after the prosecution informed the Court of Ousley's arrest denied defendant his right to cross-examine this witness.

    d.  Counsel failed to object to dual juries and failed to object to the procedure used by the Court which allowed Appellant's jury to speculate as to the

2

contents of the Co-defendant's statement.

II.      APPELLANT WAS DENIED THE RIGHT TO CONFRONT THE WITNESSES AGAINST HIM WHEN THE PROSECUTION FAILED TO DISCLOSE THAT CLINT OUSLEY HAD A PENDING CASE AND THAT CHAD YATES HAD RECENTLY RECEIVED FAVORABLE TREATMENT FROM THE PROSECUTION ON HIS CASE.

III.     THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S OBJECTION TO THE ADMISSION OF AUTOPSY PHOTOGRAPHS.

IV.      THE EVIDENCE WAS INSUFFICIENT TO SUPPORT THE FIRST DEGREE MURDER VERDICT.

V.       THE TRIAL JUDGE'S DECISION TO EMPLOY DUAL JURIES RATHER THAN HOLD SEPARATE TRIALS DENIED APPELLANT DUE PROCESS OF LAW AND THE RIGHT TO CONFRONT AND CROSS EXAMINE THE WITNESSES AGAINST HIM.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

*See People v. Copas*, No. 277240, 2008 WL 4149002 (Mich. Ct. App. Sept. 9, 2008) (per curiam).

4.       Petitioner sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Copas*, 483 Mich. 877, 759 N.W.2d 208 (2009).

5.       Petitioner, through counsel, filed the instant application for a writ of habeas corpus on December 8, 2009. As grounds for the writ of habeas corpus, he raises the claims he raised in the state courts, except for his claim regarding admission of the autopsy photographs.

6.       Respondent filed her answer on June 17, 2010. She contends that petitioner's second claim is barred by petitioner's procedural default in the state courts, and that all of his claims are without merit.

7.       Petitioner filed a reply to respondent's answer on June 30, 2010.

B.       *Factual Background Underlying Petitioner's Conviction*

3

Petitioner's convictions arise from the shooting deaths of two minors, identified as BS and

KF.  The evidence adduced at trial is accurately summarized in respondent's answer:

Clint Ousley lived in a trailer park with his sixteen-year-old friend MC. (II, 15, 48). Ousley had been dating Sarah Sykes for two months and had broken up with her; however, on Sunday, July 9, 2006, she called him repeatedly. (II, 16-17, 39, 49-51). Later, she showed up at his trailer. (II, 16-17). When Ousley went to the door, he saw Sykes and Petitioner, whom Ousley had never met, standing outside of a full-size conversion Ford van with more people inside. (II, 19-21, 51, 58, 75-76). Petitioner was throwing his hand up and calling Ousley "bitch" and telling him to step out onto the street. (II, 20-21, 59).

Ousley grabbed a bat he kept by his door and went outside. (II, 22, 60-62). Ousley told them that they needed to leave. (II, 23). Petitioner kept calling out to Ousley, wanting to fight. (II, 23). Ousley put down his bat and Tony Tard [Tard], whom Ousley did not know, jumped out of the van. (II, 23-24, 27-28, 35, 75-76). Seeing something in Tard's hand, Ousley again picked up his bat. (II, 23).

Ousley yelled to MC as well as his seventeen-year-old friend CY for help. (II, 24, 48). When MC and CY saw what was occurring, they armed themselves and came outside. (II, 24).

After exchanging words, Petitioner, Sykes and Tard left in the van. (II, 25, 63-64). As Petitioner opened the van door, however, he made a motion with his hand that resembled the cocking of a gun. (II, 27, 63-64).

Ousley put down his bat and picked up a crowbar. (II, 25). Ousley went to the area where the van was leaving and, after it swerved at him, he threw the crowbar at it, smashing the rear driver's side window. (II, 25-26).

Ousley called the police. (II, 26-27, 64).

At 11:30 p.m. that night, Ousley was inside his trailer listening to music, playing cards and smoking marijuana with MC, CY, TC, JT, JW, seventeen-year-old SB, and fourteen-year-old KF. (I, 233, 236; II, 28, 47-49, 66-69). Although Ousley's blinds were drawn, the lights inside were on. (II, 66, 70). Suddenly, "bullets started flying[.]" (II, 29). Everyone inside ran. (II, 30).

SB was hit in the chest as he was running toward the back door. (II, 30-31). Ousley helped SB down the hallway and out the back door. (II, 31). Ousley returned to his trailer. (II, 31).

Ousley found MC inside the living room, holding KF. (II, 32).

Richard Steglich lived four lots away from Ousley. (II, 149). That afternoon, Steglich was outside with his friend Pete Wisniewski when Petitioner drove by in a brown van with Sykes, JJ, who was Sykes' brother, and one or two others. (II, 151-153, 166; III, 256). Sykes stated that they were looking for Ousley. (II, 151-152). After driving by, they immediately returned. (II, 153-154). Two men got out of the van, there was a ruckus and the van left "like a bat out of hell." (II, 154-155, 164).

Later than night, Steglich was outside with Wisniewski when that same van drove by. (II, 157). Steglich, who knew that something was about to happen, yelled

out: "Don't do it." (II, 158). Even so, the van pulled up in front of Ousley's house and continuous gun fire erupted. (II, 158-161). The van then drove off. (II, 161).

Peter Wisniewski confirmed that he was with Steglich. (II, 168-169). The van came by. (II, 169-170). Sykes called Steglich over. (II, 170). JJ and KE were in the van. (II, 170). The van pulled around and returned. (II, 171). Ousley and MC came out of the trailer and the van left. (II, 172). Ousley and someone else cut through the trailer park and Wisniewski heard breaking glass. (II, 172-173).

Later that night, the van came by again. (II, 175). Steglich recognized it. (II, 175). The van's lights were off. (II, 177). When the van stopped in front of Ousley's trailer, the gun fire started. (II, 175-176). The van then pulled away. (II, 176-177).

Washtenaw County Sheriff's Department Deputy Lisa Farst was dispatched to the trailer park at 11:00 p.m. regarding a disorderly person. (III, 166, 169). She later went to Ousley's lot because the police received a loud music complaint. (III, 166-167, 180-181). Ousley was outside. (III, 167). Farst saw Steglich and Wisniewski outside and spoke to them. (III, 167-168). Farst left the trailer park at about 11:15 or 11:20 p.m. (III, 169). Farst was called back after the shooting. (III, 169-170).

The videotape from Farst's police car was played for the jury. (III, 172-173). The light in Ousley's trailer was visible on that videotape. (III, 175).

MC confirmed that Ousley called him outside on the afternoon of Sunday, July 9, 2006. (II, 79). Sykes was outside by a Ford Econoline van. (II, 79-80). MC grabbed a crowbar. (II, 80). One of the people from the van had a bat and just as they were about to start fighting, Sykes and the others got into the van and left. (II, 81). MC dropped his crowbar and went back into the house. (II, 81).

At about 11:30 p.m., MC was inside the trailer with Ousley, CY, SB, KF, JT and some other people. (II, 81-82). KF was standing by the sink in the kitchen when shots rang out. (II, 82). KF stumbled toward MC and he was holding her. (II, 82). KF had a bullet hole above her shoulder. (II, 82-83). MC called 911. (II, 83).

JT was at Ousley's trailer, standing between the kitchen and living room, with SB and CY. (II, 179-182). JT heard "[a] whole bunch" of continuous popping noises and got to the floor. (II, 183). KF instantly fell to the floor. (II, 183-184). SB was also shot and bled profusely. (II, 183-184). JT was hit in the left buttocks and right arm. (II, 185).

Washtenaw County Medical Examiner Doctor Bader Cassin performed SB's and KF's autopsies. (III, 140, 149). SB, who was 5' 8" tall, was shot in the back under his right armpit and above his elbow. (III, 141-142). The bullet traveled through SB's right lung, damaging major blood vessels and causing massive internal bleeding, which resulted in SB's death. (III, 146-147).

KF was 5' 3" tall. (III, 150). KF was shot in the right side near the middle of her back. (III, 150, 153, 157). The bullet travelled through her chest and hit her aorta, causing massive bleeding and death. (III, 150, 158-159). Other shrapnel-like objects also hit KF. (III, 153, 155).

Washtenaw County Sheriff Department Deputy Gerrod Visel arrived within minutes of the shooting. (II, 5-7). There were bullet holes "all throughout" the trailer.

(II, 10, 12). There were multiple blood spots and spatters on the kitchen floor and counters. (II, 10). The glass to the storm door had been shot out. (II, 10, 12).

LS, Sykes' sixteen-year-old sister, testified that at about 11 p.m. on July 6, 2006, she walked to a gas station with Sykes and KE, meeting Petitioner, Tard and Tackett. (III, 220; IV, 57-59, 100, 106). LS was sixteen at that time. (IV, 99). They were going to party and smoke marijuana. (IV, 106-107). LS knew Tard because he worked with her father. (IV, 107).

The girls got into the van. (IV, 60). Tard was driving, Tackett was in the front passenger seat, and Petitioner was in the remaining passenger seat with Sykes on his lap. (IV, 60, 64, 88, 108-109, 112). LS and KE sat on the mattress on the floor of the van. (IV, 60-61). They stopped at Tackett's girlfriend's house and he got something. (IV, 61). They left for Ypsilanti. (IV, 62).

Petitioner removed two long guns from underneath some clothes in the van. (IV, 65-66, 109-110). They stopped at a gas station and Tard and Petitioner purchased some blunt wraps. (IV, 67-68, 111, 113). Tard tried to cover up his license plate with a black paper bag. (IV, 68, 114-116).

At that point, Sarah Sykes, who did not have a license, was driving, KE was in the front passenger seat and LS was on the floor behind the passenger seat. (IV, 68, 112, 115).

Petitioner, Tackett and Tard were in the back of the van. (IV, 69). There were three guns. (IV, 69). Tackett had a little handgun. (IV, 70, 85). While at trial LS testified that Tackett provided all of them with gloves, at preliminary examination, she testified that only Tackett had gloves. (IV, 70-71, 92-93).

When the van arrived at Ousley's trailer park, Deputy Farst was there. (IV, 71, 117). Sykes stopped the van and turned off its lights. (IV, 71, 120).

They discussed not doing it, but Tard stated that he would shoot up the trailer. (IV, 72).

They continued driving. (IV, 73). Steglich and Wisniewski were outside. (IV, 119). Petitioner and Tard put on hoodies. (IV, 73-74, 93-94, 121). Sykes pointed out Ousley's trailer and drove by it slowly. (IV, 118, 120). Petitioner stated "shoot up into the air." (IV, 122). All three shot at the trailer with Petitioner and Tard putting their weapons on the bottom of the broken out window. (IV, 73-74, 85, 117). LS did not think that someone was in the trailer. (IV, 124-125).

They drove off, going to Tackett's house. (IV, 74-75). Tackett told LS that his gun didn't fire because it jammed. (IV, 87). Because Tackett's father was in the garage when they arrived, a guy from across the street agreed to take the guns after they were wrapped in a blanket. (IV, 76, 82).

They went to Petitioner's house and smoked marijuana. (IV, 124).

The following day, they saw the news report that BS and KF had been killed. (IV, 125-126).

After LS testified at Petitioner's preliminary examination, Petitioner's mother wanted her to change her story to help Petitioner. (IV, 102).

Fourteen-year-old KE knew Sykes. (III, 204, 255, 240). KE was dating JJ, Sykes' fifteen-year-old brother. (III, 256, 258; IV, 9-10). When KE was thirteen, she

dated Ousley. (III, 259).

A van came to Sykes' house. (III, 205-207). Petitioner was driving. (III, 208-209). Tard was in the van along with JJ and a boy and girl whom KE did not know. (III, 209, 241-242, 257-258, 262-263). They went to Ousley's trailer. (III, 212). Sykes got out of the van and went to the door. (III, 213). No one answered and Sykes walked away. (III, 213). Ousley looked out of the window and Sykes motioned for him to come out. (III, 213).

Petitioner got out of the van. (III, 213, 263). Ousley grabbed a bat. (III, 214, 263). Tard got out of the van. (III, 214). Ousley called for MC and CY. (III, 214-215). Petitioner, Sykes and Tard got back into the van at Petitioner's request and left. (III, 215, 264). As they were leaving, someone threw a crowbar through the driver's side back window, shattering it on top of KE. (III, 216-217, 239, 242, 265, 271). They drove to Petitioner's house. (III, 218).

KE and Sykes went to Sarah's mother's house while Petitioner remained in his house. (III, 218).

Later that night, KE, who was with LS, saw Petitioner's van at a gas station. (III, 220, 258). Petitioner was in the van with Sykes, Tard and Tackett. (III, 220-221; IV, 14). Tard was driving, Sykes was sitting on Petitioner's lap in the back captain's chair. (III, 222, 269). KE and LS were sitting on a mattress in the back of the van, which had three seats. (III, 224). They were driving and, eventually, stopped at a gas station, where KE saw the guns. (III, 227, 248, 254, 267; IV, 17).

When they left the gas station, Sykes was driving and Petitioner, Tard and Tackett were in the back, where they pulled out two long guns and a short gun from underneath the mattress. (III, 224-225, 227-228, 249, 252, 266-267; IV, 14). Sykes drove them to the trailer park, but Deputy Farst was there. (III, 229-230). They pulled over until Farst left and, then, continued to Ousley's trailer. (III, 230-232). Steglich was outside with Wisniewski. (III, 232-233, 271-272). There were lights on inside of Ousley's trailer. (III, 233).

The men began firing out of the van's broken window into the trailer. (III, 234). They drove off. (III, 234-235).

As they were driving back to Petitioner's house, they were throwing out shell casings. (III, 235-236).

They stopped in an alley and someone took the guns out of the van and wrapped them in a blanket. (III, 236-238; IV, 8). Tackett left. (III, 238). Petitioner, Tard, Sykes, KE and LS continued on to Petitioner's house. (III, 238-239).

Initially, KE lied to the police, telling them that she was with JJ. (IV, 9-10). KE did so because Petitioner or Tackett threatened to do the same thing that they had done to Ousley to her if she told. (IV, 16-17).

On July 10, 2006, at about 1 p.m., Pittsfield Township Police Department Detective Gordon Schick saw Petitioner on the street in Ecorse. (II, 121, 133, 145). Schick patted down Petitioner and talked to him on the corner. (II, 121, 137). Petitioner began to have "crying outbreaks" and Schick suggested that they go to the River Rouge Police Department. (II, 122, 136). Petitioner agreed. (II, 122, 135-138). During that interview, Petitioner admitted driving Sykes to Ousley's trailer during

7

the day, but denied being involved in the shooting, claiming that he was home with his mother. (II, 124, 138, 141). After that interview, Petitioner agreed to go to Washtenaw County. (II, 123, 141-142).

A couple of hours later, Petitioner was read his rights and waived them. (II, 123, 142). Petitioner then apologized for lying to the police and told them that he wanted to tell the truth. (II, 123). Petitioner again admitted to initially going to Ousley's trailer with Sykes, Tard, JJ and Sykes' friend. (II, 124). According to Petitioner, Ousley was repeatedly calling Sykes, who was going to retrieve some personal belongings from Ousley's trailer. (II, 125).

As Petitioner waited outside, Ousley came out and told someone "go get it." (II, 125). Petitioner believed that Ousley was telling that person to get a gun. (II, 125). Thereafter, Ousley took a baseball bat and hit the hood of the van. (II, 125). Someone else came outside with a crowbar and threw it through the driver's side rear window. (II, 126). Petitioner, Sykes and the others left, driving back to Petitioner's mother's house. (II, 126).

They then called Joshua Tackett [Tackett]. (II, 127). Tackett brought Petitioner a SKS assault rifle. (II, 127). Sykes and Tard, who had a rifle with a wooden stock like an AK-47, were there. (II, 128).

The four of them returned to Ousley's trailer. (II, 128-129). Just before pulling up, Petitioner turned off his van's headlights. (II, 129-130). There was a light on inside, but Petitioner didn't see anyone. (II, 130, 144, 146). Tard and Tackett fired their weapons out of the broken window in the van. (II, 130-131). Petitioner heard someone yell: "[G]o, go, go." (II, 130). Petitioner drove back to River Rouge. (II, 131). On the way, they discarded the shell casings, throwing them onto the highway. (II, 131). According to Petitioner, Tackett took the guns to Matt Droop's house. (II, 132).

Petitioner told the police that he did not know that Tard or Tackett were going to kill anyone and that he could not believe that someone had been killed. (II, 144).

Washtenaw County Sheriff's Department Detective John Scafasci processed the 1986 gray and red Econoline van with the broken driver's side rear window. (III, 184-185, 188, 190, 192). When Scafasci moved the rear driver's side seat, he found a 762 shell casing. (III, 189-190, 193, 196).

The van was found outside of Tard's house three to four days after the murders. (IV, 24-25). The police impounded the van, which had been cleaned and was missing the mattress. (IV, 25-26, 28).

Upon executing a search warrant at Matt Droop's house, the police found a .9-millimeter Carbine and a 7.62x39-millimeter SKS rifle. (IV, 32-33).

Michigan State Police Department Detective-Sergeant Jeffrey Amley was qualified as an expert in firearm identification. (III, 8-10, 78). A diagram of Ousley's trailer was admitted. (I, 259). Amley photographed numerous suspected bullet holes in Ousley's trailer. (III, 15-16, 28-29, 32-33, 36-37, 39). Amley found seventeen exterior entrance holes and eight exterior exit holes. (III, 19-23). The bullets travelled from one end of the trailer to the other with one bullet ending up in an

outside shed at a height of approximately four feet. (I, 262, 281, 296-297). There were also nine exit holes in the east middle bedroom and four entrance holes in the west interior wall. (III, 36-39). There were four exit holes in the east bathroom wall and five entrance holes in the west bathroom wall. (III, 38). There were also six entrance holes in the west wall of the master bedroom and five exit holes in the east wall. (III, 41-43, 122).

Amley found a shell casing for a 762x.39-millimeter ammunition in the street in front of Ousley's trailer. (III, 45, 49, 72). That shell casing and the shell casing recovered from the van were fired by the same weapon. (III, 73-75).

Amley collected bullet fragments in the kitchen, living room, hallway, and bedrooms. (III, 52-60). Amley found two bullets in the hallway heating duct; one was consistent with a .25-caliber bullet. (III, 56, 70). Amley could identify three bullets as having been fired from the same gun. (III, 68-69, 82). Outside of the .25-caliber bullet, the remaining bullets and bullet fragments were consistent with being fired from a .30-caliber weapon, including an AK-47 and SKS. (III, 66, 69-71, 86, 93).

In his defense, Tackett called Steven Howard, who was qualified as an expert in firearms. (IV, 139-141). Howard believed that the .25-caliber bullet had been in the heating duct for months, if not years. (IV, 143-148, 150-151).

Answer, at 3-13.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."  *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing

10

legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.     *Suppression of Evidence (Claim II)*

In his second claim, petitioner contends that he was denied a fair trial by the prosecutor's failure to disclose that Ousley had a pending charge against him and by delaying production of a firearms report.[1] The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.     *Clearly Established Law*

The Due Process Clause requires the state to disclose exculpatory evidence to the defense.

---

[1]Although the heading for this claim states that petitioner was denied his right to confront the witnesses against him by the prosecutor's actions, the body of petitioner's brief makes clear that he is bringing a suppression of evidence claim under the Due Process Clause and *Brady v. Maryland*, not a confrontation claim under the Sixth Amendment.

*See Brady v. Maryland*, 373 U.S. 83 (1963).   However, "there is no general constitutional right to discovery in a criminal case, and *Brady* did not create one."  *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).  Thus, in order to establish a *Brady* violation, petitioner must show that the prosecutor withheld evidence which was both (1) favorable to the accused and (2) material to guilt or punishment.  *See United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988).  "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  Thus, in order to establish a *Brady* claim, petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of petitioner's guilt.  *See Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000); *Luton v. Grandison*, 44 F.3d 626, 628-29 (8th Cir. 1994); *see also*, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972).  Petitioner bears the burden of establishing each of these three elements.  *See Carter*, 218 F.3d at 601.  If all three of these questions are answered in the affirmative, petitioner has established a constitutional error entitling him to the writ of habeas corpus and "there is no need for further harmless-error review."  *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).  If, on the other hand, any of these questions is answered in the negative, then petitioner has failed to establish a *Brady* violation.  Finally, although *Brady* requires disclosure of exculpatory evidence, it is well established, that "*Brady* . . . does not require the government to create exculpatory material that does not exist."  *United States v. Sukumolachan*, 610 F.2d 685, 687 (9th Cir. 1980); *see also*, *Richards v. Solem*, 693 F.2d 760,766 (8th Cir. 1982)

12

("Although the state has a duty to disclose evidence, it does not have a duty to create evidence.").

2.     *Analysis*[2]

a. *Criminal Sexual Conduct Charge Against Ousley*

Petitioner first contends that the prosecution suppressed evidence of a pending criminal sexual conduct charge against Ousley. Ousley testified on the second day of trial. Prior to the start of the third day, the prosecutor informed the court that, after the conclusion of his testimony, Ousley had been arrested on an outstanding warrant related to a criminal sexual conduct charge. Petitioner contends that Ousley testified in hopes of lenient treatment on this pending charge, and that had this information been available to expose Ousley's bias there is a reasonable probability that the result of the trial would have been different. The Michigan Court of Appeals rejected petitioner's claim, concluding both that the prosecution did not have a duty to disclose the fact that Ousley was under investigation, and that the evidence was not material. With respect to the latter conclusion, the court explained that "given the substance of Ousley's testimony, the testimony of the two eyewitnesses who saw defendant Copas shoot an assault rifle, and defendant Copas's own statement placing himself at the scene, it is not probable that evidence of Ousley's CSC charge would have made the difference between conviction and acquittal." *Copas*, 2008 WL 4149002, at *5 (quotation omitted).

─────────────────────────────

[2]Respondent contends that this claim is procedurally defaulted, because the Michigan Court of Appeals limited its review to plain error based on petitioner's failure to raise the claim in the trial court. *See Copas*, 2008 WL 4149002, at *4. Petitioner argues, however, that counsel was ineffective with respect to the late disclosed evidence, a claim which, if correct, could constitute cause to excuse petitioner's procedural default. And the ineffective assistance of counsel issue requires the Court to examine the merits of petitioner's underlying claims. Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

The Court should conclude that this determination was reasonable.

First, petitioner cannot show that the evidence of Copas's pending CSC charge was suppressed by the prosecution within the meaning of *Brady*. Regardless of whether the court of appeals was correct in concluding that the prosecution had no duty to disclose this information, the fact remains that the prosecution did disclose this information on the morning of the third day of trial. Because the purpose of *Brady* is to permit a defendant to put all exculpatory information before the jury, "*Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose." *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002) (internal quotation omitted). Even where " previously undisclosed evidence is disclosed . . . during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure." *Norris v. Schotten*, 146 F.3d 314, 334 (6th Cir. 1998) (internal quotation omitted); *accord Davis*, 306 F.3d at 421 ("Delay violates *Brady* only where the delay causes prejudice."); *United States v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994). Here, petitioner has not shown how he was prejudiced by the delayed disclosure of the pending charges against Ousley. Although Ousley had completed his testimony by that point, counsel did not seek to recall Ousley to be cross-examined about the pending charge, as he could have done had counsel thought this fact significant. *Cf. People v. David*, No. 268460, 2007 WL 2683655, at *3 (Mich. Ct. App. Sept. 13, 2007) (per curiam) (trial court abused its discretion by not allowing defendant to recall witness to cross-examine her regarding late disclosed evidence); *People v. Gray*, No. 229648, 2002 WL 31953885, at *5 (Mich. Ct. App. Dec. 13, 2002) (no prejudice from delayed disclosure of impeachment information where trial court provided defendant opportunity to recall witnesses). Because defendant had a right under state law to recall Ousley based on the newly discovered impeachment evidence, and because he

14

never sought to exercise that right, petitioner cannot show that the information was suppressed within the meaning of *Brady*.

Further, the court of appeals's conclusion that petitioner failed to establish the materiality of the evidence was reasonable. Under *Brady*, "[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987); *accord Strickler*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 682 (1985) (Blackmun, J.). Here, the evidence that Ousley was charged with CSC would not have been admissible to impeach his credibility as a general matter, because the charges did not involve an element of theft or dishonesty. *See* MICH. R. EVID. 608(b). The evidence would have been admissible only to show bias in the form of Ousley's hope for leniency in exchange for testimony favorable to the prosecution. Such cross-examination would have been of little value, however, for a number of reasons. First, there is nothing in the record which suggests either that Ousley even knew of the pending charges before his arrest, or that there was any explicit or implicit deal between Ousley and the prosecutor. Second, Ousley was subjected to extensive impeachment on other grounds during his cross-examination. In particular, Ousley was cross-examined by both petitioner's counsel and co-defendant's counsel regarding inconsistencies between his preliminary examination testimony and his trial testimony. *See* Trial Tr., Vol. II, at 40-42, 45-47, 52, 59-63; *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir.1998) (on *Brady* claim based on suppression of impeachment evidence, "where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed

15

evidence may be cumulative, and hence not material."). Third, contrary to petitioner's argument that Ousley was the prosecutions star witness without whom the prosecution would not have been able to establish petitioner's involvement, there was extensive other evidence of petitioner's involvement. Petitioner in his statements to the police admitted his presence at the scene as the driver. *See* Trial Tr., Vol. II, at 122-44. Although they did not identify petitioner in particular, both Richard Steglich and Peter Wisniewski testified to the events of both the initial confrontation and the shooting, corroborating Ousley's testimony. *See* Trial Tr., Vol. II, at 149-77. Two of the minors at Ousley's home on the evening in question, MC and JT, also testified to these facts. *See id*., Vol. II, at 79-83, 179-85. And two minors in the van with petitioner, Tard, and Tackett similarly testified to the events of the evening, identifying petitioner as one of the shooters. *See id*., Vol. III, at 205-72; Vol. IV, at 9-17, 57-122. In light of the extensive impeachment of Ousley with his preliminary examination testimony and this significant evidence against petitioner which corroborated Ousley's testimony, there is not a reasonable probability that the result of the trial would have been different had the prosecution disclosed the pending CSC charge against Ousley earlier. Thus, the Michigan Court of Appeals's application of *Brady* was reasonable, and petitioner is not entitled to habeas relief on this claim.

### b. Ballistics Evidence

Petitioner also contends that the prosecution suppressed the ballistics expert's report. The Michigan Court of Appeals rejected this claim on two grounds. First, the court found that there was no suppression, because "the record indicates that the report was completed on January 19, 2007, and provided to defense counsel that same day." *Copas*, 2008 WL 4149002, at *5. Second, the court concluded petitioner had failed to show that the report was favorable to the defense, because

"evidence that the bullets traveled in an upward trajectory was not favorable to the defense." *Id*. The Court should conclude that this determination was reasonable.

First, petitioner cannot show that the evidence was suppressed. The court of appeals determined that the report was completed on January 19, 2007, three days prior to the start of trial, and that the report was provided to defense counsel on that date. This constitutes a factual determination which is presumed correct in the absence of clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Armstrong v. Morgan*, 372 F.3d 778, 780-81, 783 (6th Cir. 2004). Petitioner has presented no such evidence, and the court of appeals's determination is supported by the testimony of the ballistics expert. *See* Trial Tr., Vol. III, at 79-80. Petitioner has failed to offer anything to show that he was prejudiced in his ability to present his defense–which was that he did not shoot at the home and that he did not know of his codefendants' intent to do so–by the disclosure of the report shortly before trial. Further, there is not a reasonable probability that the result of the trial would have been different had the jury been informed of the bullet trajectory evidence. Petitioner contends that this evidence would have allowed the jury to find him guilty of second degree murder or manslaughter, because it would have showed that he was attempting to fire above the trailer and did not intend to kill anyone. However, as the Michigan Court of Appeals reasonably explained, "although the ballistics report showed that numerous bullets traveled through the trailer in an upward trajectory, it also revealed that bullets traveled within normal height to strike individuals." *Copas*, 2008 WL 4149002, at *3. Further, the evidence showed that two assault rifles fired at least 15 bullets into the trailer, most directed at an illuminated bay window, and that two people inside the trailer were in fact struck with bullets. *See id*. In light of this evidence, there is not a reasonable probability that a jury would have reached a different

17

verdict if it had known that the bullets had traveled in an upward trajectory.[3] Thus, the Michigan Court of Appeals's resolution of this claim was reasonable, and petitioner is not entitled to habeas relief.

E.    *Sufficiency of the Evidence (Claim III)*

Petitioner next contends that the prosecution presented insufficient evidence to establish his guilt beyond a reasonable doubt. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.    *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993). However, under the amended version of

---

[3]Importantly, petitioner has pointed to no evidence, nor made any argument with respect to, the relative heights of the van from which he fired the shots and Ousley's trailer. Based on the relative heights, it may be that petitioner had to fire upwards to hit any part of, or anyone inside, the trailer. Indeed, given petitioner's contention that all of the bullets traveled in an upward trajectory and the fact that two people inside the trailer were struck, this seems likely.

§ 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision.  Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).  Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under Michigan law, the common law crime of murder is defined as second degree murder, and is punishable by up to life imprisonment.  *See* MICH. COMP. LAWS § 750.317.  To establish second degree murder, the prosecution must show that the defendant killed a human being with malice aforethought.  In order to show malice aforethought, the prosecution must establish one of three mental states on the part of the defendant at the time of the killing: (1) intent to kill; (2) intent to commit great bodily harm; or (3) intent to create a very high risk of death or great bodily harm with the knowledge that death or great bodily harm is the probable result.  *See People v. Dykhouse*, 418 Mich. 488, 495, 345 N.W.2d 150, 151 (1984); *People v. Aaron*, 409 Mich. 672, 713-14, 299 N.W.2d 304, 319-20 (1980).  Certain additional elements elevate second degree murder to first degree murder, which is punishable by a mandatory term of nonparoleable life imprisonment.

19

Specifically, under Michigan law, first degree murder includes any "[m]urder perpetrated by means of poison, lying in wait, or any other willful, deliberate, and premeditated killing."  MICH. COMP. LAWS § 750.316(1).  To establish first degree murder, the prosecution must show that a defendant had the mental state necessary for murder, that is, malice aforethought.  *See generally*, *People v. Aaron*, 409 Mich. 672, 713-21, 299 N.W.2d 304, 319-323 (1980); *People v. Turner*, 213 Mich. App. 558, 556, 540 N.W.2d 728, 732-33 (1995) (per curiam).  Under Michigan law, malice is established by showing that the defendant possessed one of three mental states:  (1) intent to kill; (2) intent to do serious bodily harm; or (3) wanton and willful disregard for the likelihood that the natural tendency of his act is to cause death or great bodily harm.  *See Aaron*, 409 Mich. at 733, 299 N.W.2d at 328.  Thus, with respect to first-degree premeditated murder, "the prosecution must prove that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate."  *People v. Anderson*, 209 Mich. App. 527, 537, 531 N.W.2d 780, 786 (1995); *see also*, *Grant v. Rivers*, 920 F. Supp. 769, 786 (E.D. Mich. 1996); *People v. Younger*, 380 Mich. 678, 681, 158 N.W.2d 493, 495 (1968); *People v. Brown*, 137 Mich. App. 396, 407, 358 N.W.2d 592, 597 (1984).

Premeditation occurs where there was sufficient time between the homicidal intent and the action to afford a reasonable person time to take a second look.  *See People v. Gonzalez*, 468 Mich. 636, 641, 664 N.W.2d 159, 163(2003); *Brown*, 137 Mich. App. at 407, 358 N.W.2d at 597.  The minimum time required for premeditation is "incapable of exact determination," and may be merely seconds or minutes or hours, depending on the totality of the circumstances surrounding the killing.  *Marsack v. Howes*, 300 F. Supp. 2d 483, 490-91 (E.D. Mich. 2004) (Lawson, J.).  Further, it is well established that both intent to kill and "premeditation and deliberation may be

inferred from the circumstances surrounding the killing." *People v. Ortiz-Kehoe*, 237 Mich. App. 508, 520, 603 N.W.2d 809 (1999); *accord Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998); *People v. McRunels*, 237 Mich. App. 168, 181, 603 N.W.2d 95, 102 (1999); *Anderson*, 209 Mich. App. at 537, 531 N.W.2d at 786.   Relevant factors include the relationship of the parties, the defendant's actions prior to the killing, the circumstances of the killing, and the defendant's conduct after the killing.  *See id.*; *Brown*, 137 Mich. App. at 407, 358 N.W.2d at 597.

   2.   *Analysis*

   Petitioner contends that the prosecution presented insufficient evidence to show that he intended to kill either the actual victims or anyone else at Ousley's home, or that he acted with premeditation or deliberation.[4]  The Michigan Court of Appeals rejected this claim.  In doing so, the court noted that evidence presented at trial showing that petitioner was involved in a confrontation with Ousley earlier in the day, at which time petitioner "gestured the movement of cocking a gun;" petitioner and his codefendants left his house with two assault rifles; his codefendant covered the van's license plate; petitioner positioned himself in the rear section of the van near the broken window; petitioner and his codefendants waited for a police officer to leave Ousley's home; petitioner fired an assault rifle at Ousley's trailer; and at least 15 bullets were fired into the trailer, most in the area of the bay window.  *See Copas*, 2008 WL 4149002, at *7.  From this evidence, viewed in the light most favorable to the prosecution, the court  concluded that the evidence was sufficient to establish both intent to kill and premeditation:

   The evidence that Copas armed himself with an assault rifle after being involved in

--------

   [4]Petitioner does not argue that the prosecution presented insufficient evidence of the malice element of murder, and concedes that if he prevails on his sufficiency of the evidence claim the appropriate relief would be "for murder in the first degree [to] be reduced to murder in the second degree."  Pet'r's Br., at 29.

> a confrontation with Ousley earlier in the day, went back to Ousley's trailer, and
> fired the rifle through the bay window of the trailer at a height calculated to strike a
> human target, was sufficient to permit a rational trier of fact to reasonably infer that
> defendant Copas possessed an intent to kill.  Additionally, the drive from Ecorse to
> Ypsilanti, and the delay at the trailer park while waiting for the law enforcement
> officer to leave the area, demonstrated that there was sufficient time to take a second
> look and supported a finding of premeditation and deliberation.

*Id*. at *8 (internal quotation omitted).  The Court should conclude that this determination was

reasonable.

Petitioner's argument focuses on the fact that neither his statement, nor the testimony of the

two minors in the van at the time of the shooting, establish that he intended to kill.  Rather, petitioner

contends that this testimony and his statement reflect that he intended only to cause property

damage.  Further, petitioner contends that there was no evidence that he knew anyone was home,

because the trailer was dark and there were no lights on in the trailer.  The evidence viewed in the

light most favorable to the prosecution, however, supports a finding beyond a reasonable doubt both

that petitioner premeditated the murders and intended to kill Ousley.  As the court of appeals

observed, the evidence showed that petitioner, along with his codefendants, retrieved assault rifles

after the initial confrontation with Ousley and returned to Ousley's trailer later in the day.  The

evidence also showed that petitioner and his codefendants waited in their van while a police officer

left Ousley's trailer.  This was more than sufficient to establish that petitioner had the time to, and

in fact did, premeditate the murders.  Further, circumstantial evidence supports a finding of

petitioner's intent.  First, petitioner had motive, having been involved in an altercation with Ousley

earlier in the day.  Second, although some shots apparently traveled in an upward trajectory, a

number of shots were fired directly into the trailer, most concentrated around the large bay window.

Third, contrary to petitioner's argument, there was some evidence that a light was on in the trailer,

and in any event petitioner and his codefendants had seen a police officer talking with Ousley at the trailer shortly before the shooting.  From this evidence, a rational jury could have found beyond a reasonable doubt that defendant intended to kill Ousley.[5]

Petitioner's argument is essentially that the evidence was insufficient because there was no direct evidence of his intent.  This argument is not supported by law.  As the Sixth Circuit has explained, the absence of direct evidence of intent is "a situation that is not unusual in murder cases generally.  Rarely is direct evidence of premeditation and intent available in a murder case, except where a confession is received in evidence." *DeLisle v. Rivers*, 161 F.3d 370, 389 (6th Cir. 1998).  For this reason, it is well established that intent to kill need not be proved by direct evidence, but rather may be proved by circumstantial evidence and reasonable inferences drawn from the evidence.  *See Warren*, 161 F.3d at 360; *Hoffman*, 225 Mich. App. at 111, 570 N.W.2d at 15.  The jury's duty in such a case is to "examine the evidence of [petitioner's] conduct and infer what he thought and what he intended to do from what he did and failed to do." *DeLisle*, 161 F.3d at 389.  Specifically, and in addition to other factors, the Court "may take into consideration 'the nature of

---

[5]it is irrelevant that petitioner did not premeditate and intend the killing of the actual victims.  "The principle of 'transferred intent' makes an actor criminally responsible for the results of his conduct, even thought the person injured is not his intended victim." *State ex rel S.B.*, 755 A.2d 596, 599 (N.J. Super. Ct. App. Div. 2000); *accord* 1 LAFAVE & SCOTT, SUBSTANTIVE CRIMINAL LAW § 6.4(d) (2d ed.).  Michigan courts apply the common law doctrine of transferred intent.  *See People v. Lawton*, 196 Mich. App. 341, 350-51, 492 N.W.2d 810, 815 (1992); *People v. Youngblood*, 165 Mich. App. 381, 388, 418 N.W.2d 472, 475 (1988).  As explained by the Michigan Court of Appeals in a case involving a charge of assault with intent to commit great bodily harm, "[b]efore defendant can be convicted it must first be shown that he had the intention to cause great bodily harm to someone.  Merely because he shot the wrong person makes his crime no less heinous.  It is only necessary that the state of mind exist, not that it be directed at a particular person." *People v. Lovett*, 90 Mich. App. 169, 172, 283 N.W.2d 357, 359 (1979).  In other words,  it does not matter whom at the home petitioner intended to kill.  So long as he intended to kill someone, the requisite mental state for murder is established, even if he ultimately killed someone who was not his initial target.  *See Lawton*, 196 Mich. App. at 350-51, 492 N.W.2d at 815; *Youngblood*, 165 Mich. App. at 388, 418 N.W.2d at 475.

the defendant's acts constituting the assault . . . [and] whether the instrument and means used were naturally adapted to produce death[].'" *Warren*, 161 F.3d at 360 (quoting *People v. Taylor*, 422 Mich. 554, 375 N.W.2d 1, 8 (1985)).  As explained above, taken in the light most favorable to the prosecution the evidence showed that petitioner armed himself with an assault rifle after a confrontation with Ousley, returned to Ousley's home, and fired multiple shots directly into the trailer knowing that Ousley and others were inside.  This evidence was sufficient to support a finding that petitioner both intended and premeditated the killings.  *See People v. Coates*, No. 200658, 1998 WL 1992478, at *2 (Mich. Ct. App. Mar. 24, 1998) (per curiam); *People v. Turner*, No. 186053, 1997 WL 33351193, at *2 (Mich. Ct. App. Apr. 11, 1997) (per curiam); *see also*, *Government of the Virgin Islands v. Jacobs*, 438 F.2d 329, 331 (3d Cir. 1971) (per curiam); *Johnigan v. Elo*, 207 F. Supp. 2d 599, 608 (E.D. Mich. 2002) (Steeh, J.); *People v. Ritsema*, 105 Mich. App. 602, 609, 307 N.W.2d 380, 383 (1981); *People v. Johnson*, 54 Mich. App. 303, 304, 220 N.W.2d 705, 706 (1974).  Such a conclusion is not speculation, but rather a fair "infer[ence of] what [petitioner] thought and what he intended to do" based on "the evidence of [petitioner's] conduct."  *DeLisle*, 161 F.3d at 389.

This conclusion is not altered by the testimony of the two minors in the van, nor by petitioner's statement to the police, which petitioner contends establish only that he intended to cause property damages.  "The fact that the testimony is contradictory does not mean that evidence is insufficient, only that the jury must make credibility determinations."  *Government of the Virgin Islands v. Isaac*, 50 F.3d 1175, 1179 (3d Cir. 1995).  It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution.  *See Jackson*, 443 U.S. at 326; *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996).  Further, that the evidence might equally support other,

24

innocent, inferences is irrelevant; the prosecution's evidence need not rule out every hypothesis other than petitioner's guilt to be sufficient. *See Jackson*, 443 U.S. at 326. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Joint Trial (Claim IV)*

Petitioner next contends that he was denied a fair trial by virtue of being tried jointly, but before separate juries, with his codefendant. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

The Supreme Court has recognized no general right to a separate criminal trial. In *Zafiro v. United States*, 506 U.S. 534 (1993), the Court considered "whether Rule 14 [of the Federal Rules of Criminal Procedure] requires severance as a matter of law when codefendants present 'mutually antagonistic defenses.'" *Zafiro*, 506 U.S. at 535. *Zafiro*, however, was based solely on Rule 14, and did not establish any rule of constitutional law. It is thus inapplicable to petitioner's state court conviction. *Cf. Williams v. Singletary*, 114 F.3d 177, 181 (11th Cir. 1997) (noting that *Zafiro* involved an interpretation of the Federal Rules of Criminal Procedure and thus "it is not at all clear that *Zafiro* establishes a rule of constitutional law to be applied to state court judgments in § 2254 proceedings," but finding it unnecessary to resolve the question); *Henry v. Scully*, 918 F. Supp. 693, 714 n.7 (S.D.N.Y. 1995) ("Petitioner's counsel argues that Henry's trial counsel erred in failing to request a severance. This argument, which depends upon Henry's having had a constitutional right to a severance, is without merit. Henry has shown no federal constitutional right to a severance.").

Because there is no constitutional right to severance *per se*, habeas relief will be warranted for a trial court's failure to sever a petitioner's trial from that of his codefendants only where the

25

denial itself deprives the petitioner of a fundamentally fair trial.  In other words, "a state trial court's refusal to grant severance mandates habeas corpus relief (1) when the joint trial 'resulted in the deprivation of a specific constitutional guarantee such as the right to call witnesses . . . or the right to confrontation,' or (2) when the joint trial abridged the defendant's 'fundamental right to a fair trial as secured by the Fourteenth Amendment.'"  *Turpin v. Kassulke*, 26 F.3d 1392, 1404 (6th Cir. 1992) (Feikens, D.J., concurring in part and dissenting in part) (quoting *Jenkins v. Bordenkircher*, 611 F.2d 162, 168 (6th Cir. 1979)); *accord Hutchinson v. Bell*, 303 F.3d 720, 731 (6th Cir. 2002).  However, joint trials are favored, and the potential for prejudice alone is insufficient to mandate severance. *See Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001).

2.    *Analysis*

The Michigan Court of Appeals rejected petitioner's claim, reasoning that the charges were properly joined because they "arose out of a single criminal episode that involved numerous witnesses and substantially identical evidence."  *Copas*, 2008 WL 4149002, at *8.  The court also explained that "[a]lthough each defendant made a statement to the police that attempted to exculpate himself to a certain degree and implicate the other defendant, the use of separate juries alleviated the concern that a single jury might be exposed to one defendant's exculpatory evidence that was inadmissible with respect to the other codefendant."  *Id*.  Because petitioner failed to show any prejudice resulting from the joinder of the charges, the court rejected petitioner's claim.  This conclusion was reasonable.

Petitioner has identified no constitutional rights which he was denied by the failure of the trial court to sever his case from those of his codefendants, nor has he shown that he was denied a fair trial.  Petitioner does not point to any evidence admissible only against his codefendant which

26

was admitted at his trial, nor does he claim that the procedure employed by the trial court prevented him from presenting any evidence or cross-examining any witnesses. Petitioner has thus failed to point to specific instances of prejudice resulting from the failure to sever his trial. *See Vincent v. Seabold*, 226 F.3d 681, 691 (6th Cir. 2000).

Petitioner, relying on *Bruton v. United States*, 391 U.S. 123 (1968), argues that he was denied a fair trial because the case involved interlocking confessions given by him and his codefendant. In *Bruton*, the Court "held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 207 (1987) (discussing *Bruton*, 391 U.S. at 135-36). *Bruton* is not implicated here, however, because the confession of petitioner's codefendant was never presented to petitioner's jury. Petitioner attempts to bring his case within the *Bruton* rule, arguing that because the jury was told that it would not be hearing certain evidence which would only be heard by the codefendant's jury, and because petitioner's confession which was read to his jury implicated the codefendant, "[i]t [was] no great intellectual leap for the jury to figure out that when it was absent, the Tackett jury was hearing Tackett's statement which would have included descriptions of what Defendant Copas did on July 9. Thus, defendant's conviction rests on speculation as to the contents of the Tackett statement." Pet'r's Br., at 17.

Petitioner's argument, however, is an argument directed against the use of dual juries at all. Such an argument is contrary to the well established practice of using dual juries in circumstances such as those present in petitioner's case, *see Wilson v. Sirmons*, 536 F.3d 1064, 1099 (10th Cir. 2008) (citing cases); *Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir. 1999) (en banc) (citing

27

cases), and with the Supreme Court's express approval of dual juries as one means of avoiding *Bruton* problems, *see Gray v. Maryland*, 523 U.S. 185, 192 (1998) (emphasis added) ("Unless the prosecutor wishes to hold separate trials or *to use separate juries* or to abandon use of the confession, he must redact the confession to reduce significantly or to eliminate the special prejudice that the *Bruton* Court found."). *Bruton* requires that a court not permit a defendant's jury to hear a codefendant's confession implicating the defendant, and "dual juries help assure that very compartmentalization by keeping dangerous evidence from the ears of the jurors for the defendant to whom it does not apply." *Lambright*, 191 F.3d at 1186. Further, petitioner's "argument that each defendant's jury will 'necessarily speculate' about the evidence being heard by the other defendant's jury is itself rank speculation." *Id*. at 1186 n.5. Here, petitioner points to no inadmissible evidence which was presented to his jury, nor to any evidence which he was not able to subject to cross-examination. Any speculation as to what the jurors in his case may themselves have speculated about when only his codefendant's jury was hearing evidence is insufficient to satisfy petitioner's burden of pointing to specific instances of prejudice resulting from the failure to sever his trial. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.       *Ineffective Assistance of Counsel (Claim I)*

Finally, petitioner contends that his trial counsel was ineffective in a number of respects. Specifically, petitioner contends that counsel was ineffective for failing to: (1) challenge the admissibility of his statements to the police; (2) investigate his defense and elicit evidence that supported the defense; (3) recall Ousley or ask for a mistrial after being informed of Ousley's arrest; and (4) object to the use of dual juries. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.    *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Id*. at 687.  These two components are mixed  questions of law and fact.  *Id*. at 698.  Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id.* at 697.  If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  *Id.*  With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance.  *See id*.  at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).  "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted).  "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id*. at 690.  With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id*. at 695.  It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim.  *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v.*

29

*Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

2.    *Analysis*

a. *Failure to Challenge Statements*

Petitioner first argues that counsel was ineffective for failing to challenge the admissibility

of his statements to the police.  Petitioner contends that his first statement to the police was taken in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and that his second statement was involuntary.  The Michigan Court of Appeals rejected petitioner's claim.  Without commenting on whether the statements were in fact subject to exclusion, the court concluded that counsel's failure to challenge the statements was a reasonable strategic decision:

> Defendants Copas's convictions arise from his participation with codefendants Tackett, Tony Tard, and Sarah Sykes in a drive-by shooting of Clint Ousley's trailer during which two teenagers were killed. Two eyewitnesses testified that defendant Copas was in the rear of a van and fired an assault rifle while codefendant Sykes drove the van. The defense theory was that defendant Copas was the driver of the van rather than a shooter, had no idea that codefendants Tackett or Tard intended to harm anyone, and did not know that anyone was in Ousley's trailer. The primary support for this theory came from defendant Copas's police statement. It is apparent that one of defense counsel's strategies was to support the defense and counteract the testimony against defendant Copas with defendant Copas's account of the events as described in his police statement. As the trial court aptly noted when denying defendant Copas's motion for a new trial on this basis, the admission of defendant Copas's statement allowed the jury to hear his version of events without subjecting him to cross-examination. Trial counsel's decision to proceed in this manner was not objectively unreasonable or prejudicial.

*Copas*, 2008 WL 4149002, at *1.  Under the doubly deferential approach mandated by *Harrington*, this determination was reasonable.

Here, as the court of appeals explained, counsel could have reasonably concluded that it was desirable to have petitioner's second statement to the police admitted into evidence.[6]  Petitioner's

---

[6]Because an evidentiary hearing was not held, there is no way to know for sure whether counsel knowingly pursued this strategy. This fact, however, does not affect the analysis. As the Supreme Court explained in *Harrington*, "[a]lthough courts may not indulge '*post hoc* rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions." *Harrington*, 131 S. Ct. at 790 (quoting *Wiggins*, 539 U.S. at 526–527).  The Court emphasized that "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect,'" *id.* (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam)), and that "*Strickland* calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.* (citing *Strickland*, 466 U.S. at 688).  Thus, the Court must presume that counsel's failure

31

theory of the case was that he only drove the van, and did not know that anyone intended to shoot into Ousley's trailer.   Unfortunately for petitioner, all the other evidence presented at trial contradicted this version of events–the two other passengers in the van testified that petitioner obtained the guns, was not driving, removed the guns from under the mattress, and fired a gun through the van's broken window.   There were only two ways in which counsel could get petitioner's version of events before the jury–either through his statements to the police, which were consistent with petitioner's version, or through petitioner's testimony at trial.   The latter course, however, would have subjected petitioner to cross-examination.   In the circumstances presented, counsel could have reasonably concluded that it was better to avoid the risk of cross-examination by allowing petitioner's statements, which supported his and not the prosecutor's version of events, to be admitted.   *See McKinnon v. Ohio*, No. 94-4256, 1995 WL 570918, at *9 (6th Cir. Sept. 27, 1995); *Benge v. Johnson*, 312 F. Supp. 2d 978, 1024-25 (S.D. Ohio 2004), *aff'd*, 474 F.3d 236, 242 (6th Cir. 2007); *Thomas v. McNeil*, No. 5:06cv18, 2008 WL 5056277, at *15 (N.D. Fla. Nov. 21, 2008); *cf. Guzman v. Runnels*, 174 Fed. Appx. 408, 409 (9th Cir. 2006).

Further, even if counsel were deficient, petitioner cannot demonstrate that he was prejudiced because there is not a reasonable probability that the outcome of the trial would have been different had his statements to the police been suppressed.   *See Strayhorn v. Booker*, 718 F. Supp. 2d 846, 871 (E.D. Mich. 2010) (Zatkoff, J., adopting report of Komives, M.J.).   Petitioner's second statement

---

to challenge the statements was the result of a deliberate trial strategy in the absence of evidence in the record to the contrary.   Here, the record supports the conclusion that counsel's failure to challenge petitioner's statements was a deliberate strategic choice.   Counsel repeatedly referred to petitioner's statements, during both opening statement and closing argument, to support petitioner's theory that he only drove the van and did not know that anyone intended to shoot at the trailer.   *See* Trial Tr., Vol. I, at 231; Vol. IV, at 209, 213, 219.   The only question here, therefore, is whether this strategy was reasonable.

to the police was exculpatory only to the extent that it placed him in the van at the time of the second shooting. This fact, however, was well established by other evidence, and petitioner does not suggest any additional evidence which could have called into question the prosecution's evidence of his presence. The balance of petitioner's statement was either exculpatory or mitigating, placing him as the driver with no knowledge of the other occupants' plan to shoot at Ousley's trailer. Petitioner offers no reason to believe that the jury would have been any *less* inclined to convict him if this exculpatory or mitigating evidence was *not* before the jury. There is therefore no reasonable probability that the result of the proceeding would have been different had counsel sought and achieved suppression of his statements to the police. Because counsel's failure to challenge the statements was the result of a reasonable strategic decision, and because in any event petitioner was not prejudiced by the admission of those statements, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b. Failure to Investigate/Elicit Evidence

Petitioner next contends that counsel failed to properly investigate the case, resulting in counsel's failure at trial to elicit evidence which would have supported petitioner's defense. Specifically, petitioner contends that counsel should have called Officer Lisa Farst, who investigated a loud music complaint shortly before the shooting, and should have elicited evidence regarding the bullet trajectories. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

With regards to Officer Farst, petitioner contends that counsel should have elicited from her information which would have supported his statement that he had no idea anyone was home in the trailer. According to petitioner Farst, who minutes before the shooting had been in the area

33

investigating a noise complaint, testified at the degree hearing for petitioner's accomplices "that she observed the trailer with a closed window blind and saw no shadows moving inside. Ousley met her outside the trailer. The officer could not tell if anybody was inside." Pet'r's Br., at 12. The Michigan Court of Appeals rejected this claim, reasoning that the basic substance of this testimony had indeed been elicited from Farst, and corroborated by other evidence. The court noted that Farst testified at trial regarding her observations of the trailer, that the jury saw a video made from Farst's patrol car showing the conditions of the trailer five minutes before the shooting, and that evidence that the blinds were closed was presented through the ballistics expert and this fact was not disputed at trial. Based on this evidence, the court of appeals concluded that "[a]lthough Farst did not testify using the precise words she allegedly used at the degree hearing for codefendants Tard and Sykes, her observations were presented to the jury. Thus, there is no basis for concluding that defense counsel was ineffective for not further questioning Farst about her observations, or that his failure to do so was prejudicial." *Copas*, 2008 WL 4149002, at *2. This determination was reasonable.

Petitioner has failed to explain how more detailed examination of Farst, or counsel's failure to elicit the exact statements Farst made at the codefendants' degree hearing, affected his trial. Regardless of the precise words used by Farst, the jury had before it all of the relevant information, namely, that there were no people visibly around the trailer, and that the blinds were closed. Morever, the jury was shown a video depicting the conditions of the trailer at the time Farst was there. In these circumstances, petitioner cannot show that counsel's performance was deficient, nor can he show that he was prejudiced by counsel's performance.

Petitioner also contends that counsel was ineffective for failing to elicit from the ballistics expert evidence that the bullets traveled in an upward trajectory, supporting his defense that he was

34

attempting to fire over the trailer to cause property damage or scare Ousley.  The Michigan Court

of Appeals found that petitioner was not prejudiced by counsel's failure to elicit this testimony, in

light of the evidence that two people were actually struck; two assault rifles were used to fire at least

15 shots most concentrated in the area of the bay window; and the ballistics report revealed that

several bullets "traveled within normal height ranges to strike individuals."  *Copas*, 2008 WL

4149002, at *3.  This determination was reasonable.  As explained above in connection with

petitioner's *Brady* claim, the firing of some, or even all, of the bullets in an upward trajectory was

not necessarily indicative of an intent other than an intent to kill.  The firing of multiple shots at the

trailer, coupled with the fact that two occupants were in fact struck, makes it unlikely that this

additional information would have affected the jury's assessment of the evidence.  At a minimum,

the court of appeals's conclusion that it would not have done so is reasonable.  Accordingly, the

Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c.  Failure to Recall Clint Ousley

Petitioner next contends that counsel was ineffective for failing to other recall Ousley or

move for a mistrial following the prosecutor's disclosure that Ousley was arrested on a CSC charge

following his testimony.  Specifically, petitioner contends that counsel should have recalled Ousley

to cross-examine him as to whether he knew about the charge before he testified and, if so, whether

it provided him a motive to change his testimony in exchange for a hope of leniency.  The Michigan

Court of Appeals rejected this claim, reasoning that petitioner has failed to provide "any support for

his claim that Ousley was aware of the unrelated warrant before he testified in this case, let alone

that there was any arrangement whereby Ousley would receive leniency in that case in exchange for

his testimony in this case."  *Copas*, 2008 WL 4149002, at *3.  The court of appeals also reasoned

that petitioner was not prejudiced because "the principle evidence implicating defendants Copas and Tackett at trial came from two eyewitnesses who were in the van with the defendants during the shooting." *Id.* This determination was reasonable.

Petitioner correctly notes that, contrary to the court of appeals's suggestion, it does not matter if Ousley actually had a deal with the prosecutor. If Ousley merely had a subjective hope of obtaining leniency on his pending charge in exchange for his testimony, this hope would have been relevant to Ousley's motive for testifying. However, the court of appeals was correct to observe that petitioner has failed to point to anything showing that Ousley knew of the pending charges at the time he testified. And without knowledge that he faced a CSC charge, Ousley would have had no reason to seek leniency. Further, Ousley was extensively impeached by counsel with the inconsistencies between his preliminary examination and trial testimony, and as the court of appeals observed the principle and most damaging evidence against petitioner came from the other occupants of the van, not from Ousley. Thus, as explained in connection with petitioner's *Brady* claim relating to this evidence, in light of the extensive impeachment of Ousley with his preliminary examination testimony and this significant evidence against petitioner which corroborated Ousley's testimony, there is not a reasonable probability that the result of the trial would have been different had counsel questioned Ousley about the pending CSC charge. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### d. Failure to Object to Dual Juries

Finally, petitioner contends that counsel was ineffective for failing to object to a joint trial with dual juries, and for failing to object to the trial court's statement that each jury was going to hear some evidence that the other jury would not hear. As explained above in connection with

36

petitioner's substantive claim relating to the dual juries, there was no error in the trial court's use of this procedure, and the trial judge's comments did not provide any basis on which the jury would have speculated as to the testimony heard by the other jury.  Thus, petitioner cannot show that counsel was ineffective for failing to object to either the use of dual juries or the trial judge's comments.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to

deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id*., advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.      *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability, for the reasons explained above.  With respect to petitioner's *Brady* claims, the ballistics report and the existence of the CSC charge were disclosed shortly prior to or during trial, and petitioner has offered

nothing to show that the allegedly late disclosure of this information was prejudicial in the sense that counsel was unable to make use of the evidence if he so desired. Further, for the reasons explained above petitioner cannot show that this evidence was material within the meaning of *Brady*. Thus, the resolution of these claims is not reasonably debatable. With respect to petitioner's sufficiency of the evidence claim, there was significant circumstantial evidence–including motive, the actions of petitioner and his codefendants in covering the van's license plate and waiting for an officer to leave the area, and the number and location of shots fired–from which the jury could conclude that petitioner both intended and premeditated the killing of someone inside the trailer. Thus, the resolution of this claim is not reasonably debatable. Further, the use of dual juries prevented any inadmissible evidence from reaching petitioner's jury, and there is nothing to support petitioner's speculation that his jury must have inferred that Tackett gave a confession implicating petitioner. Thus, the resolution of petitioner's dual juries claim is not reasonably debatable. Finally, the resolution of petitioner's ineffective assistance claims, most of which are derivative of his substantive *Brady* and dual juries claims, are not reasonably debatable for the reasons explained above. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

I.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).   Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.   The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.   The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated:  June 1, 2011

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or

40

parties of record by electronic means or U.S. Mail on June 1, 2011.

s/Susan Jefferson_____
Deputy Clerk